UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

SEATTLE DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>LAKSHA BOHRA, VIKY BOHRA, and GOTHAM BOHRA,<br><br>Defendants. | No. 2:20-cv-01434<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission (the "SEC") alleges:

## SUMMARY OF THE ACTION

1. This case involves a multi-year insider-trading scheme conducted by Laksha Bohra ("Bohra"), a finance manager employed at Amazon.com, Inc. ("Amazon" or the "Company"), her husband, Viky Bohra, and her father-in-law, Gotham Bohra. Bohra misused highly confidential Amazon financial information for her and her family's personal gain. Bohra provided her husband with sensitive, material, and nonpublic information concerning Amazon's financial performance that she obtained through her employment. Bohra or her husband also provided this same information to Bohra's father-in-law. Ahead of each Amazon earnings

COMPLAINT
*SEC V. BOHRA ET AL.* (NO. 2:20-CV-01434)

1

Securities and Exchange Commission
44 Montgomery Street, Suite 2800
San Francisco, California 94104
(415) 705-2500

announcement between January 2016 and July 2018, Bohra's husband, and in some instances Bohra's father-in-law, traded Amazon stock and options, at least in part, on the basis of the material nonpublic information that Bohra provided. The family together made, in total, a profit of approximately $1.4 million from these illegal insider Amazon trades.

2. Bohra's husband and Bohra's father-in-law traded in 11 separate brokerage accounts with the same brokerage firm based, at least in part, on inside information provided by Bohra. These accounts were owned by Bohra, Bohra's husband, Bohra's father-in-law, Bohra's mother-in-law, and Bohra's sister-in-law.

3. Through their actions, Defendants Laksha Bohra, Viky Bohra, and Gotham Bohra violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j (b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and, unless restrained and enjoined, will continue to violate the federal securities laws.

**JURISDICTION AND VENUE**

4. The SEC brings this action pursuant to Sections 21(d), 21(e), and 21A of the Exchange Act [15 U.S.C. § 78u(d), 78u(e), and 78u-1].

5. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. 78u(d), 78u(e), 78u-1, and §78aa].

6. Laksha Bohra, Viky Bohra, and Gotham Bohra (collectively the "Bohra Defendants"), directly or indirectly, made use of the means or instruments or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged herein.

7. Venue is proper in this District pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, courses of business, and transactions constituting the violations alleged herein occurred within the Western District of Washington. Pursuant to LCR 3(e)(1), assignment to the Seattle Division is appropriate because a substantial part of the relevant conduct occurred in King County.

COMPLAINT
*SEC V. BOHRA ET AL.* (NO. 2:20-CV-01434)

2

Securities and Exchange Commission
44 Montgomery Street, Suite 2800
San Francisco, California 94104
(415) 705-2500

# DEFENDANTS

8. **Laksha Bohra** ("Bohra") is 36 years old and resides in Bothell, Washington. Bohra started as a Transfer Pricing Manager in Amazon's Tax Department in December 2012, and received a promotion to Senior Manager in May 2018. As a member of the Tax Department, which is part of Amazon's Finance organization, Bohra had access to Amazon's financial reporting databases and shared network files, and her responsibilities included assisting Amazon's Accounting Department in calculating and reviewing transfer pricing for intercompany transactions ahead of earnings announcements and throughout the year. Amazon suspended Bohra's employment on or about October 25, 2018, and Bohra resigned shortly thereafter.

9. **Viky Bohra aka Vik Bohra** (the "Husband") is 36 years old and resides in Bothell, Washington with his wife, Defendant Laksha Bohra. Since 2015, Viky Bohra has been employed as a Program Manager at a Fortune 500 public technology company, and prior to that he worked as an engineer at two large public companies.

10. **Gotham Bohra** (the "Father-in-Law") is 63 years old and is Viky Bohra's father and Laksha Bohra's father-in-law. Gotham Bohra resides part-time in Bothell, Washington, less than two miles away from his co-defendants, and is also a part-time resident of Redondo Beach, CA. Since 2017, Gotham Bohra has been employed as an engineer with a government contractor based in Los Angeles, California. Prior to that, he worked as an engineer at a large public company.

# OTHER RELEVANT ENTITY

11. **Amazon.com, Inc.** ("Amazon" or the "Company") is a publicly-traded technology and retail company incorporated in Delaware and headquartered in Seattle, Washington. Amazon's common stock was, during the time period addressed in this Complaint, and currently is, registered under Section 12(b) of the Exchange Act [15 U.S.C. § 78*l*] and listed on the NASDAQ Global Select Market under the ticker "AMZN."

COMPLAINT
*SEC V. BOHRA ET AL.* (NO. 2:20-CV-01434)
3
Securities and Exchange Commission
44 Montgomery Street, Suite 2800
San Francisco, California 94104
(415) 705-2500

# FACTUAL ALLEGATIONS

### A. Bohra Had Access to Highly Confidential Amazon Earnings Information.

12. From at least January 2016 through July 2018, as part of her work in Amazon's Tax Department, Bohra prepared and reviewed intercompany transaction calculations, which the Accounting Department used as part of its process to finalize the Company's quarterly and annual earnings numbers for its 10-Q and 10-K filings. Throughout this period, Bohra accessed and reviewed confidential financial reporting databases and shared network files.

13. At the end of each quarter, Amazon's Tax Department assisted the Accounting Department in preparing the Company's 10-Q or 10-K filing. As part of this quarter-close process, Bohra reviewed and signed off on files containing Amazon's intercompany transactions. These files also contained other information concerning Amazon's financial performance, including the Company's net revenues and operating expenses on a global level and for each corporate subsidiary on a twelve-month trailing basis.

14. Bohra and others in the Tax Department sent their proposed adjustments to the Accounting Department, which then sent the consolidated near-final numbers to Amazon's auditor. After the auditor's review, the Tax Department suggested any final adjustments. Bohra was at times involved in this secondary review process. The final numbers were then updated in a confidential database and posted to shared network folders accessible by the Tax Department. Bohra thus had access to Amazon's preliminary and final quarterly and annual numbers before they were publicly announced.

15. In addition, as a manager in Amazon's Tax Department, Bohra had ongoing access to Amazon's confidential financial databases. The group regularly retrieved information from the databases in order to perform certain intercompany transaction calculations throughout the year, not just at every quarter-end. Thus, Bohra had access to Amazon's real-time financial performance throughout her employment.

16. Amazon considered all of the above pre-release financial information to be confidential, highly sensitive, material, and nonpublic.

COMPLAINT
*SEC V. BOHRA ET AL.* (NO. 2:20-CV-01434)
4
Securities and Exchange Commission
44 Montgomery Street, Suite 2800
San Francisco, California 94104
(415) 705-2500

**B. Bohra Was Obligated to Maintain Confidentiality, to Refrain from Amazon Trades During Blackout Periods or Based on Insider Information, and to Pre-Clear All Amazon Options Trades.**

17. Throughout her employment, Amazon repeatedly informed Bohra that she owed an obligation to maintain the confidentiality of Amazon's financial information, and to refrain from trading in Amazon securities based on material nonpublic information. Amazon conveyed these duties to her in its employment agreement, employee manual, insider trading policies (including Insider Trading Guidelines and FAQs), bi-annual ethics trainings, and quarterly email reminders—and reiterated these obligations in September 2017 after another Amazon finance employee was criminally convicted of insider trading.

18. In December 2012, Bohra signed an employment agreement at the start of her employment in which she agreed not to disclose the Company's confidential information, including information in the Company's financial statements such as revenues, expenses, and net income. Bohra also signed a mandatory certification acknowledging that she read, understood, and would comply with (1) the policies and practices set forth in Amazon's employee manual, and (2) Amazon's Code of Business Conduct and Ethics, which contained the Company's insider trading policy, and the accompanying Insider Trading Guidelines and FAQs. The manual, policy, guidelines, and FAQs concerning insider trading were also made available on Amazon's intranet page, were referenced in email reminders to Bohra, and were accessible to Bohra throughout her employment.

19. Amazon's insider trading policy prohibited Bohra from trading securities while in possession of material nonpublic information and from passing on material nonpublic information to others or recommending to others that they trade in securities while in possession of material nonpublic information. The employee manual's section on insider trading stated: "[I]f you have material information that has not been disclosed to the public by the company, you may not buy, sell, or enter into any other type of transaction involving any Amazon securities." It also stated: "You may not give material nonpublic information to friends or family members or to any other third parties nor may you advise friends or family members or any other parties to trade based on material nonpublic information."

COMPLAINT
SEC V. BOHRA ET AL. (NO. 2:20-CV-01434) 5

Securities and Exchange Commission
44 Montgomery Street, Suite 2800
San Francisco, California 94104
(415) 705-2500

20. Amazon's Insider Trading Guidelines, which provided further details on the Company's insider trading policy, described "[a]ctual earnings or losses" as an example of material information.

21. Moreover, as described in the employee manual, Bohra and certain other employees "and members of their households" were categorically prohibited from trading Amazon securities during certain blackout periods each quarter, "generally beginning on the first day of the last month of the company's fiscal quarter and ending on the third day following the quarterly earnings announcement." Bohra understood that these blackout periods applied to her and her household members, and she told her Husband that these trading restrictions applied to him.

22. Every quarter, Bohra received emails from Amazon's management—from an Amazon corporate email account named "tradingpolicy"— reminding her that she could not trade Amazon securities during the blackout period, and that even if a trading window was open, she could not trade if she possessed material nonpublic information about Amazon.

23. These quarterly reminder emails "discouraged" trading in options or other derivative securities based on Amazon stock, and mandated that "all such transactions require preclearance" by the Legal Department. As further explained in Amazon's Insider Trading FAQs, "puts, calls, warrants and other types of option securities" were required to "be cleared in advance with the Legal Department, regardless of whether that employee is otherwise subject to preclearance or to the trading window, even if that employee is not in possession of material nonpublic information."

24. These quarterly reminder emails further admonished Bohra that she was prohibited from "[p]assing material nonpublic information on to others or recommending to anyone the purchase or sale of the Company's securities on the basis of such information," emphasizing that the Company's insider trading policy also applied "to transactions by family members and other persons living in an employee's household."

25. On September 28, 2017, Bohra received another pointed reminder about the insider trading prohibition from Amazon's CFO. Following an Amazon employee's criminal

COMPLAINT
SEC V. BOHRA ET AL. (NO. 2:20-CV-01434)
6
Securities and Exchange Commission
44 Montgomery Street, Suite 2800
San Francisco, California 94104
(415) 705-2500

insider trading conviction and settlement with the SEC for passing earnings information to a friend, the CFO noted Amazon's "zero tolerance" for insider trading, explaining that "compliance with securities law and protecting confidential information are paramount to the work we do at Amazon but particularly in the Finance organization," and included an insider-trading training video. This email was sent to the entire Finance organization, including Bohra, which reminded recipients of their duty to "protect confidential information even from inadvertent disclosures."

26. As an Amazon employee, Bohra completed mandatory training on the Company's insider trading policy every two years, and most recently completed the training in December 2017.

### C. The Bohra Defendants Maintain Control of the Family Brokerage Accounts.

27. All told, the Bohra Defendants maintain control over 11 separate brokerage accounts with the same brokerage firm, some of which are owned by Bohra's mother-in-law ("Mother-in-Law") and Bohra's sister-in-law ("Sister-in-Law"). All of the accounts are connected to three usernames associated with Bohra and her Father-in-Law, such that those usernames have control over multiple accounts at the same time. The following table summarizes the usernames and accounts to which the usernames were granted access:

| Username | Parent Account | Parent Account Owner | Linked Account | Linked Account Owner |
|---|---|---|---|---|
| lakdel | 918 | Laksha Bohra | 497*[1] | Husband (Viky Bohra) |
| | | | 445 | Husband (Viky Bohra) |
| skiam | 081 | Father-in-Law (Gotham Bohra) | 497* | Husband (Viky Bohra) |
| | | | 495 | Mother-in-Law |
| skisav | 407 | Father-in-Law (Gotham Bohra) | 529 | Father-in-Law (Gotham Bohra) |
| | | | 577 | Mother-in-Law |
| | | | 749 | Mother-in-Law |
| | | | 917 | Husband (Viky Bohra) |
| | | | 691 | Sister-in-Law |

---

[1] The 497 account owned by Bohra's Husband is linked to both the lakdel and skiam usernames.

COMPLAINT
SEC V. BOHRA ET AL. (NO. 2:20-CV-01434)
7
Securities and Exchange Commission
44 Montgomery Street, Suite 2800
San Francisco, California 94104
(415) 705-2500

28. Despite ownership by just Bohra and her Father-in-Law, the three usernames were used to conduct Amazon securities transactions in all 11 accounts.

29. All three usernames (lakdel███, skiam███, and skisav███) frequently logged in from Bohra and her Husband's residence in Bothell, WA as well as from her Husband's then-current places of employment.

30. The two usernames owned by Bohra's Father-in-Law (skiam███ and skisav███) frequently logged in from his residence in Bothell, WA as well as from his residence in Redondo Beach, CA after he started living part-time at that address.

31. There were numerous occasions where one username would be logged in from Bohra and her Husband's Bothell residence or from her Husband's workplace at or around the same time another username would be logged in from her Father-in-Law's Bothell residence or her Father-in-Law's part-time Redondo Beach residence.

32. The Bohra Defendants informed the brokerage firm's representatives that it was their desire to exercise actual common control of all the brokerage accounts owned by their family members. As a result, all 11 brokerage accounts were held and managed in a familial manner such that the assets were held in common for the family.

33. In particular, in or around November 2014, Bohra told the brokerage firm that her Husband traded in her account. Similarly, in or around August 2018, Bohra's Husband called the brokerage firm, explained that he was "trying to buy Amazon," and asked questions about Bohra's account. This prompted the brokerage firm's representative to request to speak with Bohra, who immediately picked up the phone and answered security questions such as the approximate current value of her account. Bohra then told the representative that she approved of whatever changes that her Husband was attempting to make to her account.

34. Bohra's Father-in-Law sometimes identified himself to the brokerage firm's representatives by the name of Bohra's Mother-in-Law when communicating about accounts held in her name. And in or around April 2018, Bohra's Father-in-Law told the brokerage firm that he treated his and his wife's accounts as the same "because we are all one family," and in referencing securities trading decisions, he stated: "We all treat it as one family thing."

COMPLAINT
SEC V. BOHRA ET AL. (NO. 2:20-CV-01434-JCC)
8
Securities and Exchange Commission
44 Montgomery Street, Suite 2800
San Francisco, California 94104
(415) 705-2500

Similarly, in or around June 2018, Bohra's Father-in-Law introduced himself by his own name and proceeded to inform the brokerage firm's representative that he had been buying and selling Amazon securities "quite frequently" in the account belonging to Bohra's Mother-in-Law and asked detailed questions concerning those transactions.

### D. From January 2016 to July 2018, Bohra's Husband and Bohra's Father-in-Law Executed Amazon Trades Ahead of Every Amazon Earnings Announcement, and These Trades Occurred During Prohibited Blackout Periods.

35. Between January 2016 and July 2018, Bohra's Husband and Bohra's Father-in-Law collectively traded in Amazon securities regularly, including ahead of every single Amazon earnings announcement. The trades ahead of Amazon's earnings announcements occurred during trading blackout periods that were imposed by Amazon on Bohra and members of her household.

36. Additionally, Bohra's Husband and Bohra's Father-in-Law frequently traded Amazon stock options. A "call option" is a financial contract between two parties that gives the buyer the right, but not the obligation, to buy an agreed quantity of stock during a specified time period for a specified price, known as the strike price. A "put option" is a financial contract that gives the buyer the right, but not the obligation, to sell an agreed quantity of stock. A buyer of call or put options pays a fee, or premium, to purchase this right. A buyer of a call option generally stands to gain if the price of the stock increases, while a buyer of a put option generally stands to gain if the price of the stock decreases.

37. In order to trade Amazon options, Bohra was required by Amazon to first obtain express preclearance from Amazon's Legal Department, whether the trades were for her own account or in the account of a household member. But Bohra did not seek or obtain such preclearance.

38. Between January 2016 and July 2018, the Bohra Defendants used material nonpublic information about Amazon's financial performance to trade ahead of 11 Amazon earnings announcements and made, in total, a profit of approximately $1.4 million from these trades.

COMPLAINT
*SEC V. BOHRA ET AL.* (NO. 2:20-CV-01434)
9
Securities and Exchange Commission
44 Montgomery Street, Suite 2800
San Francisco, California 94104
(415) 705-2500

### E. Bohra Provided Material Nonpublic Information About Amazon.

39. Between January 2016 and July 2018, Bohra provided to her Husband material nonpublic information about Amazon's financial performance. Bohra or her Husband then provided this same information to Bohra's Father-in-Law. Bohra's Husband and Bohra's Father-in-Law then traded Amazon securities in the brokerage accounts in the names of the Bohra Defendants, Bohra's Mother-in-Law, and Bohra's Sister-in-Law.

40. The Bohra Defendants' actions surrounding the fourth fiscal quarter of 2017 and first fiscal quarter of 2018 earnings announcements are illustrative of their years of insider trading.

#### 1. Trading In Advance of the Q4 2017 Earnings Announcement and 10-K Filing

41. Between around January 2, 2018 and January 16, 2018, Amazon's Tax Department worked on the quarter-close process for the fourth fiscal quarter of 2017. As part of that process, Bohra completed her initial review of the financial model for that quarter on January 9, 2018.

42. Prior to the completion of Bohra's initial review, her Husband had purchased 500 Amazon shares in put options in his account on January 8. These put options had an expiration date of February 16, 2018, and they represented his expectation that Amazon's stock price would fall by that date. Amazon's fourth fiscal quarter and year end 2017 earnings were scheduled to be announced on February 1, 2018.

43. On January 10, 2018, Bohra used her work computer to access and review a spreadsheet saved on the Finance Department's shared network folder for Accounting Reports that detailed the Company's U.S. income statement.

44. On January 12, 2018, Bohra hosted a fiscal quarter of 2017 review meeting with her team and also used her work computer to view a financial news website's coverage of Amazon and its stock price.

45. On January 15, 2018, Bohra used her work computer to search Google for "AMZN." On that same day, Bohra also accessed and reviewed the file containing Amazon's U.S. income statement, which she had previously reviewed on January 10, 2018.

46. On January 16, 2018, the earnings numbers for the Company's earnings report were finalized. On that same day, Bohra used her work computer to look up the income statement for Amazon's prior quarter, and she visited Amazon's Investor Relations website to view the prior quarter's results. She then looked up a news article from October 2017 reporting that Amazon's stock price went up after the company's financial results beat expectations in the prior quarter, and she viewed a section of the NASDAQ.com website that provided a comparison of the estimated and reported EPS for Amazon's prior quarters and described the current consensus EPS forecast for the fourth fiscal quarter of 2017.

47. Over the next few days, Bohra continued to access Amazon's confidential financial information, including Amazon's global consolidated income statement and auditor-reviewed adjustments to the quarter's financial model. Bohra also repeatedly looked up Amazon's stock price and financial news coverage of Amazon.

48. During this same period, Bohra's Husband sold the put options that were held in his account and instead purchased both Amazon common stock and Amazon call options in his account as well as accounts belonging to Bohra's Father-in-Law and Bohra's Mother-in-Law, now betting that Amazon's stock price would increase.

49. For example, on the morning of January 19, 2018, Bohra's Husband logged into the brokerage firm's website with Bohra's username from their home address and purchased 200 shares of Amazon common stock in his account.

50. On the morning of January 22, 2018, Bohra's Husband again logged in from his home and sold the 500 Amazon shares in put options that were in his account and replaced them with a purchase of 1,000 Amazon shares in call options. That afternoon, Bohra's Husband logged in from his workplace to purchase 4,000 Amazon shares in call options in his account; 2,000 Amazon shares in the same call options in one of Bohra's Mother-in-Law's accounts; 1,000 Amazon shares in the same call options in another of Bohra's Mother-in-Law's account;

and 1,000 Amazon shares in the same call options in Bohra's Father-in-Law's account. The call options purchased that afternoon had the same strike price and expiration date.

51. Over the next few days, Bohra's Husband and Bohra's Father-in-Law continued to purchase Amazon common stock and call options, selling call options they had purchased on January 22 and 23 and replacing them with new call options at higher strike prices that they purchased on January 24, 25, and 26, and on February 1.

52. Throughout this purchasing period, Bohra communicated with her Husband and her Father-in-Law via phone calls and text messages, and she frequently used her work computer to look up Amazon's latest stock price on a financial website.

53. By the time that Amazon's fourth fiscal quarter and year end 2017 earnings was announced on February 1, 2018, Bohra's Husband and Bohra's Father-in-Law had spent more than $850,000 on purchasing Amazon call options and common stock in order to trade, at least in part, based on the material nonpublic information that Bohra had provided.

54. None of the transactions were pre-cleared by Amazon's Legal Department, and all were executed during the Company's trading blackout period. Each of these trades was entered using one of the three primary usernames used by the Bohra Defendants to access their brokerage accounts.

55. On February 1, 2018, at or around 1:00 p.m. when the market closed, Bohra visited Amazon's Investor Relations website. Bohra also visited a section of the NASDAQ.com website called "Amazon.com, Inc. (AMZN) Earnings Report Date" that provided the "consensus EPS forecast for the quarter" based on analysts' forecasts. Bohra viewed a financial news article called "Amazon fourth quarter 2017 earnings" coverage of Amazon's expected earnings announcement that day and searched Google on her work computer for "amazon earnings" and "what time does the market close." She also conducted a news search about "amazon earnings" on Twitter and viewed tweets about Amazon's earnings announcement from her work computer.

56. On February 1, 2018, after the market closed, Amazon announced its fourth fiscal quarter and year end 2017 earnings. The next day, February 2, 2018, Amazon's stock price increased 2.87% over the prior day's closing price.

COMPLAINT
*SEC V. BOHRA ET AL.* (NO. 2:20-CV-01434-JCC)

12

Securities and Exchange Commission
44 Montgomery Street, Suite 2800
San Francisco, California 94104
(415) 705-2500

57. On the morning of February 2, 2018, Bohra's Husband logged in with Bohra's username from their home and sold Amazon call options in his and Bohra's Father-in-Law's accounts. One minute later, Bohra's Husband logged in with Bohra's Father-in-Law's username from an IP address near Kent, WA and sold Amazon call options held in an account belonging to Bohra's Mother-in-Law. Eight minutes after that, Bohra's Father-in-Law logged in with his username from his residence in Redondo Beach, CA. On February 5, 2018, Bohra's Husband logged in with Bohra's username from their home and sold the remaining Amazon common stock in his account.

58. In total, accounts belonging to Bohra's Husband, her Father-in-Law, and her Mother-in-Law made a profit of approximately $664,000 by trading Amazon common stock and Amazon call options ahead of Amazon's fourth fiscal quarter and year end 2017 earnings announcement.

2. **Trading In Advance of the Q1 2018 Earnings Announcement and 10-Q Filing**

59. Between around April 2, 2018 and April 16, 2018, Amazon's Tax Department worked on the quarter-close process for the first fiscal quarter of 2018.

60. Bohra and her Husband were on vacation in Europe from around April 5, 2018 through April 19, 2018, but Bohra brought her work computer with her on their trip.

61. Amazon finalized the earnings numbers for its first fiscal quarter of 2018 earnings report on April 16, 2018, while Bohra and her Husband were still on their vacation. By logging in remotely to Amazon's network through her work computer, Bohra accessed Amazon's preliminary quarterly earnings numbers on April 11 and 12, 2018, and accessed Amazon's auditor-reviewed earnings numbers on April 18, 2018, including Amazon's consolidated balance sheet and consolidated income statement.

62. The morning of April 18, 2018, Bohra's Husband logged into the brokerage firm's website repeatedly with Bohra's username from Athens, Greece, and purchased Amazon call options in his account. While these trades were being placed, Bohra's Father-in-Law repeatedly logged in with his username from his home in Bothell, WA. A few hours later,

COMPLAINT
*SEC V. BOHRA ET AL.* (NO. 2:20-CV-01434)

13

Securities and Exchange Commission
44 Montgomery Street, Suite 2800
San Francisco, California 94104
(415) 705-2500

1   Bohra's Husband repeatedly logged in from Athens using Bohra's username and Bohra's Father-
2   in-Law's usernames to purchase additional Amazon call options in his account and to purchase
3   Amazon call options with the same strike price and expiration date in Bohra's Father-in-Law and
4   Bohra's Mother-in-Law's accounts. Immediately after these trades were completed, Bohra's
5   Father-in-Law logged in with his username from his home in Bothell, WA.

6       63.     On the morning of April 26, 2018—the day of Amazon's earnings
7   announcement—Bohra's Husband purchased additional Amazon call options in his account,
8   Bohra's Father-in-Law's account, and Bohra's Mother-in-Law's accounts And, at or around
9   12:50 p.m. on April 26, 2018—just 10 minutes before the first fiscal quarter of 2018 earnings
10  announcement—Bohra's Husband acquired an additional 1,000 Amazon shares in call options in
11  his account.

12      64.     On April 26, 2018, after the market closed, Amazon announced its first quarter
13  2018 earnings. The next day, April 27, 2018, Amazon's stock price increased 3.6% over the
14  prior day's closing price.

15      65.     Shortly after Amazon's earnings announcement on April 26, 2018, Bohra
16  searched Google on her work computer for "Amazon stoc[k]" and visited a financial news article
17  titled "Amazon Earnings Q1 2018."

18      66.     That evening on April 26, 2018, from 7:56 p.m. until 11:20 p.m., Bohra and her
19  Husband exchanged multiple calls and text messages, and Bohra's Husband and Father-in-Law
20  exchanged multiple calls and text messages from 8:10 p.m. until 9:34 p.m.

21      67.     The next morning, on April 27, 2018, Bohra's Father-in-Law logged in from his
22  Redondo Beach residence using his username and sold Amazon call options held in his accounts
23  and in Bohra's Mother-in-Law's accounts. That same morning, Bohra's Husband logged in from
24  his home with Bohra's username and sold Amazon call options held in his accounts.

25      68.     None of the transactions were pre-cleared by Amazon's Legal Department, and
26  all were executed during the Company's prohibited blackout period. In total, the Bohra
27  Defendants made a profit of approximately $591,000 by trading ahead of Amazon's first fiscal
28  quarter of 2018 earnings announcement.

COMPLAINT
*SEC V. BOHRA ET AL.* (NO. 2:20-CV-01434)

14

Securities and Exchange Commission
44 Montgomery Street, Suite 2800
San Francisco, California 94104
(415) 705-2500

69.     A few weeks later, in June 2018, Bohra's Father-in-Law called the brokerage firm to discuss the account belonging to Bohra's Mother-in-Law. He explained to the brokerage firm representative that he had been buying and selling Amazon stock in this account "quite frequently" and complained that the brokerage firm's determination of the cost basis of Amazon stock was different from what it should be based on his own calculations. The brokerage firm representative offered to review this issue and to send a report of all Amazon transactions in the account for the past four months. The brokerage firm sent a 13-page letter addressed to Bohra's Mother-in-Law that outlined all of her account's trading in Amazon options and delivered it via its online messaging service.

**F.     The Bohra Defendants Acted with Scienter.**

70.     At the time of the trading described above, Bohra knew, or was reckless in not knowing, that the information regarding Amazon's earnings results and financial performance was confidential to Amazon before it was released publicly.

71.     At the time of the trading described above, Bohra owed Amazon a fiduciary duty, or an obligation arising from a relationship of trust or confidence, to keep confidential any material nonpublic information regarding Amazon's quarterly and annual earnings results and financial performance. And from at least January 2016 through July 2018, Bohra knew, or was reckless in not knowing that she was prohibited from trading on the basis of the material nonpublic information about Amazon's earnings. Indeed, the Company repeatedly reminded Bohra of restrictions prohibiting her from trading Amazon securities, or tipping others to trade, based on the confidential Amazon information, including reminders regarding the Company's insider trading policy, trading blackout periods, and frequent emails about trading restrictions.

72.     Bohra breached her duty of confidentiality to Amazon by providing the material nonpublic financial information to her Husband, which she or her Husband then provided to her Father-in-Law, knowing that her Husband and her Father-in-Law would trade Amazon securities based on the confidential information.

73.     At the time of the trading described above, Bohra's Husband, Viky Bohra, also acted with scienter. He traded Amazon stock, at least in part, on the basis of the material

COMPLAINT
*SEC V. BOHRA ET AL.* (NO. 2:20-CV-01434)
15
Securities and Exchange Commission
44 Montgomery Street, Suite 2800
San Francisco, California 94104
(415) 705-2500

1  nonpublic information Bohra provided to him, and passed on the material nonpublic information
2  to Bohra's Father-in-Law. He knew, or was reckless in not knowing, that the information was
3  nonpublic. He also knew, was reckless in not knowing, or should have known that Bohra
4  provided the material nonpublic information in breach of her duty of trust or confidence to
5  Amazon.

6    74. Similarly, at the time of the conduct described above, Bohra's Father-in-Law,
7  Gotham Bohra, acted with scienter. He traded Amazon stock, at least in part, on the basis of the
8  material nonpublic information Bohra or Bohra's Husband provided to him. He knew, or was
9  reckless in not knowing, that the information was nonpublic. He also knew, was reckless in not
10 knowing, or should have known that Bohra provided the material nonpublic information in
11 breach of her duty of trust or confidence to Amazon.

## FIRST CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

**(The Bohra Defendants)**

15    75. The SEC realleges and incorporates by reference paragraphs 1 through 78, as
16 though fully set forth herein.

17    76. By engaging in the conduct described above, Laksha Bohra, Viky Bohra, and
18 Gotham Bohra, in connection with the purchase or sale of securities, directly or indirectly, by the
19 use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities
20 of a national securities exchange, with scienter:

21    (a) employed devices, schemes, or artifices to defraud;
22    (b) made untrue statements of material fact or omitted to state material facts
23          necessary in order to make the statements made, in the light of the circumstances
24          under which they were made, not misleading; and/or
25    (c) engaged in acts, practices, or courses of business which operated or would operate
26          as a fraud or deceit upon other persons, including purchasers and sellers of
27          securities.

28    77. By engaging in the foregoing conduct, Laksha Bohra, Viky Bohra, and Gotham

COMPLAINT
*SEC V. BOHRA ET AL.* (NO. 2:20-CV-01434)
16
Securities and Exchange Commission
44 Montgomery Street, Suite 2800
San Francisco, California 94104
(415) 705-2500

Bohra each violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that this Court:

I.

Permanently restrain and enjoin the Bohra Defendants from, directly or indirectly, violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

II.

Order the Bohra Defendants to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

III.

Order the Bohra Defendants to pay civil monetary penalties under Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

IV.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

V.

Grant such other and further relief as this Court may deem just, equitable, and necessary.

COMPLAINT
*SEC V. BOHRA ET AL.* (NO. 2:20-CV-01434)

17

Securities and Exchange Commission
44 Montgomery Street, Suite 2800
San Francisco, California 94104
(415) 705-2500

Dated:  September 28, 2020

Respectfully submitted,

 /s/ Sallie S. Kim
Sallie S. Kim (Conditionally Admitted Pursuant to LCR 83.1(c)(2))
Securities and Exchange Commission
44 Montgomery Street, Suite 2800
San Francisco, California  94104
Telephone:  (415) 705-2500
Facsimile:  (415) 705-2501
Email:  KimSal@sec.gov
*Attorney for Plaintiff Securities and Exchange Commission*

COMPLAINT
*SEC V. BOHRA ET AL.* (NO. 2:20-CV-01434)

18

**Securities and Exchange Commission**
44 Montgomery Street, Suite 2800
San Francisco, California 94104
(415) 705-2500